UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

         v.

RAJ RAJARATNAM,

         *Defendant*.

15 Civ. 5325 (LAP)
S2 09 Cr. 1184 (LAP)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT RAJ RAJARATNAM'S MOTION PURSUANT TO 28 U.S.C. § 2255
TO VACATE CONVICTIONS AND SENTENCE**

QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

*Attorneys for Raj Rajaratnam*

November 6, 2015

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

RELEVANT BACKGROUND ...................................................................................................3

ARGUMENT ..............................................................................................................................4

I.     THE CONVICTIONS ON COUNTS TWO, FIVE, EIGHT, NINE, AND TEN
       SHOULD BE VACATED ON THE BASIS OF *NEWMAN* ................................................4

       A.     Mr. Rajaratnam Is Actually Innocent of Insider Trading with Respect to
              Each of the Counts and Trades He Has Challenged ................................................5

              1.     Count Two:  Khan Conspiracy (Polycom, Hilton, and Google
                     Trades) ........................................................................................................5

              2.     Counts Five, Eight, Nine, and Ten (Akamai Trades) ................................9

              3.     The ICST Trade Underlying Count One...................................................13

       B.     Mr. Rajaratnam's Former Counsel Rendered Ineffective Assistance of
              Counsel ..................................................................................................................17

II.    ANIL KUMAR'S PERJURY REQUIRES VACATUR OF THE CONVICTIONS
       ON COUNTS FOUR AND THIRTEEN.........................................................................18

CONCLUSION..........................................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Bousley v. United States*, 523 U.S. 614 (1998)................................................5

*Chiarella v. United States*, 445 U.S. 222 (1980) ........................................12

*Dirks v. SEC*, 463 U.S. 646 (1983) ........................................... *passim*

*Hedgepeth v. Pulido*, 555 U.S. 57 (2008) ........................................12

*Napue v. Illinois*, 360 U.S. 264 (1959) ........................................19

*United States v. Dickler*, 64 F.3d 818 (3d Cir. 1995) ........................13

*United States v. Dove*, 247 F.3d 152 (4th Cir. 2001)........................13

*United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008) ........................12

*United States v. Loschiavo*, 531 F.2d 659 (2d Cir. 1976)........................5

*United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), *cert. denied*, 2015 WL 4575840 (U.S. Oct. 5, 2015) ........................................... *passim*

*United States v. Robinson*, 545 F.2d 301 (2d Cir. 1976) ........................3

*United States v. Seijo*, 514 F.2d 1357 (2d Cir. 1975) ........................2, 18

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)........................18

*United States v. Whitman*, --- F. Supp. 3d ----, 2015 WL 4506507 (S.D.N.Y. July 22, 2015)........9

*Yates v. United States*, 354 U.S. 298 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978) ........................................12

## STATUTES

28 U.S.C. § 2255........................................................................4

## OTHER AUTHORITIES

1 Sand *et al.*, *Modern Federal Jury Instructions—Criminal* ¶ 3.01, Instr. 3-6 (2015) ........3

U.S. Sentencing Comm'n, *Guidelines Manual* § 1B1.3 (Nov. 2015) ........13

## PRELIMINARY STATEMENT

Mr. Rajaratnam has challenged only the validity of the Counts, and relevant conduct, that are tainted by the "doctrinal novelty" found to be fatally flawed in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), *cert. denied*, 2015 WL 4575840 (U.S. Oct. 5, 2015)—namely, the government's targeting of remote tippees in insider trading cases, while disclaiming the need to prove the defendant's knowledge of any "personal benefit" received by the insider. *Id.* at 448.

The government's effort to demonstrate that its proof at Mr. Rajaratnam's trial satisfied *Newman*'s requirements is fundamentally misconceived. For each of the Polycom, Hilton, Google, Akamai, and ICST trades, the government was obligated to present proof that Mr. Rajaratnam knew that the remote insider who disclosed the information upon which the trade was based received a personal benefit in exchange. The government identifies no such proof. Instead, the government argues that despite its failure to adduce proof specific to these trades, insider trading was proven because Mr. Rajaratnam is a "sophisticated businessman" who must have "understood from experience" that "high level corporate insiders required significant benefits to breach their duties." Opp. 2, 23, 25, 29.

*Newman* rejected this same argument, and although the government evidently struggles to accept it, that ruling is binding here. The Second Circuit characterized the government's position in *Newman* as follows: "The Government now invites us to conclude that the jury could have found that the appellants knew the insiders disclosed the information 'for some personal reason rather than for no reason at all.'" *Newman*, 773 F.3d at 454 (quoting government brief). The Court then immediately rejected that "invitation": "But the Supreme Court affirmatively rejected the premise that a tipper who discloses confidential information necessarily does so to receive a personal benefit." *Id.* (citing *Dirks v. SEC*, 463 U.S. 646, 661-62 (1983)). The Second Circuit also found that the very insiders who had disclosed the information on which Newman and

Chiasson had traded did so out of reasons of "mere friendship" or the equivalent, and not any "objective, consequential" benefit that qualifies as a personal benefit. *See id.* at 452-53. Far from finding that a remote tippee's knowledge of the insider's breach of a fiduciary duty is a foregone conclusion, the *Newman* Court stated that "it is easy to imagine a . . . trader who receives a tip and is unaware that his conduct was illegal and therefore wrongful." *Id.* at 450 (quotation omitted) (ellipses in original).

Simply put, if the government's argument were correct, *Newman* would not hold as it does. The convictions on the challenged Counts should be vacated, and the Court should order resentencing, including for the reason that the trades challenged in this motion accounted for nearly half of the $63.8 million in realized gains or avoided losses for which Mr. Rajaratnam was held responsible at sentencing. PSR ¶ 58.

Equally misjudged is the rejoinder to Mr. Rajaratnam's argument that Anil Kumar's perjury requires vacatur of the convictions on Counts Four and Thirteen. The government argues that Kumar repeatedly "reaffirmed" Mr. Rajaratnam's guilt during his testimony at Rengan Rajaratnam's 2014 trial. Opp. 33-38. Whether Kumar offered evidence *sufficient* to support the jury's verdict against Mr. Rajaratnam, however, is not the question. The question is whether Mr. Rajaratnam could have "induced a reasonable doubt in the minds of enough jurors to avoid a conviction," had he been able to impeach Kumar's credibility using the admissions and contradictions that emerged at Rengan's trial. *United States v. Seijo*, 514 F.2d 1357, 1364 (2d Cir. 1975) (quotation omitted). The government itself saw a "direct"—and potentially game-changing—conflict when it sought to impeach its own witness at Rengan's trial—although now it asserts that Kumar was making "mistake[s] of recollection." *Compare* R.Tr. 1038 *with* Opp.

37.[1]  Nor does the government even attempt to rebut Kumar's devastating repudiations of the testimony on which it relied in arguing to the jury that the information Kumar provided was non-public and superior to the other information conceded to be available to Mr. Rajaratnam.  The convictions on Counts Four and Thirteen should be vacated or, at a minimum, a hearing held to assess Kumar's credibility.

## RELEVANT BACKGROUND

Despite the fact that Mr. Rajaratnam is challenging under *Newman* only the validity of certain convictions based on certain trades, the government's opposition refers to Counts and trades not put at issue by Mr. Rajaratnam.  *E.g.*, Opp. 5-6 (discussing conspiracy with Rajiv Goel and Counts Three, Six, Seven, and Fourteen).

The relevant inquiry is Count- and trade-specific.  It is axiomatic that the jury must consider "each count separately" and that a finding of guilty or not guilty "as to any one offense should not affect [its] verdict as to any other offense charged."  1 Sand *et al.*, *Modern Federal Jury Instructions—Criminal* ¶ 3.01, Instr. 3-6 (Nov. 2015); *see United States v. Robinson*, 545 F.2d 301, 304 (2d Cir. 1976) (reversing convictions for possessing checks stolen from the U.S. mails where there was no proof that the checks had been deposited in the mails, because even if it was "most unlikely" that checks disbursed from three different offices would have come into common possession of defendant without being taken from the mails, "it is not so unlikely" that a single check was acquired not from the mails).  Further, under *Newman* the inquiry is whether the defendant knew, in relation to the inside information on which he or she traded, that the insider disclosed that information in breach of a fiduciary duty, *i.e.*, in exchange for an

---

[1]  Exhibits referenced herein are annexed to the Declaration of Christine H. Chung, dated June 16, 2015 (Dkt. 356). Abbreviations are the same as those used in the opening brief.  (Dkt. 355).

"objective, consequential" benefit.  773 F.3d at 448 (government must prove that "the tippee knows of the personal benefit received by the insider in exchange for *the* disclosure") (emphasis supplied).[2]

For the Court's convenience, a table of the charged Counts and the trades which were encompassed by each Count is annexed as Appendix A.[3]

**ARGUMENT**

## I.   THE CONVICTIONS ON COUNTS TWO, FIVE, EIGHT, NINE, AND TEN SHOULD BE VACATED ON THE BASIS OF *NEWMAN*

The government nowhere disputes that *Newman* announced a new rule of substantive law that is retroactively applicable.  Opp. 1 (*Newman* "redefined the elements of insider trading in this Circuit").  It also agrees that if Mr. Rajaratnam demonstrates his actual innocence, a "fundamental miscarriage of justice" will have occurred such that Section 2255 relief must be granted, notwithstanding his failure on direct appeal to raise the claims he makes in his Section 2255 motion.  Opp. 18.  The government does not dispute that Mr. Rajaratnam can independently overcome "procedural default" by demonstrating constitutionally ineffective assistance of counsel.  Opp. 21-22.  For the reasons that follow, Mr. Rajaratnam has demonstrated both.

---

[2]   The jury was likewise instructed to engage in a Count- and trade-specific inquiry.  *E.g.*, Tr. 5510-11 (instruction requiring separate consideration of each Count); Tr. 5616 (requiring jury to consider "in connection with *the* purchase or sale of a security specified in the count you're considering" whether scheme to defraud was proven) (emphasis supplied); Tr. 5619-22 (requiring jury to find that the insider had a "relationship of trust and confidence with the company that owned *the business information at issue*," and that "the insider breached that duty of trust and confidentiality by disclosing material, non-public information and receiving a personal benefit *for doing so*") (emphases supplied).  As described in the opening brief (Mot. 14-18), and *infra* at n.10, however, the trial court failed altogether to instruct the jury to find the element of knowledge-of-benefit.

[3]   The sources for the information in Appendix A are the second superseding indictment, the government's opposition brief, the trial summations, and the Pre-Sentence Report ("PSR").

A.    **Mr. Rajaratnam Is Actually Innocent of Insider Trading with Respect to Each of the Counts and Trades He Has Challenged**

The government appears to have accepted the holding of *Newman* to this extent:  it recognizes "knowledge-of-benefit" to be an element of the insider trading crime.  Opp. 25, 29, 32.  Because the record "discloses no proof whatever of [an] element[] of the crime charged," Mr. Rajaratnam's motion should be granted.  *United States v. Loschiavo*, 531 F.2d 659, 666 (2d Cir. 1976) (vacating conviction where record revealed no proof of element of bribery required by precedent decided after petitioner had exhausted direct appeals); *see Bousley v. United States*, 523 U.S. 614, 623 (1998) (actual innocence is demonstrated where "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted") (quotation omitted).

1.    **Count Two:  Khan Conspiracy (Polycom, Hilton, and Google Trades)**

As to each of the three trades underlying Count Two, which together were estimated at sentencing to have resulted in a gain of over $22 million to Mr. Rajaratnam (or over one-third of the total gain (or avoidance of loss) figure of $63.8 million adopted at sentencing) (PSR ¶ 58), the government failed to prove Mr. Rajaratnam's knowledge of any benefit received by any of the remote insiders.  The government did not call Roomy Khan, the intermediary common to all three trades who relayed to Mr. Rajaratnam the information that three different insiders provided to her.  The three insiders, Sunil Bhalla, an executive at Polycom, Deep Shah, an analyst at Moody's, and Shammara Hussain, an analyst at Market Share Partners, also did not testify.

In its opposition brief, the government describes proof from which the jury could have concluded that two of the three insiders in fact received a benefit from Khan.  Opp. 24-25.  Thus, the government contends that the proof offered at trial showed that:  (1) in connection with the Polycom trade, in January 2006, Bhalla had given Khan authority to trade securities in an account he maintained at Lehman Brothers; and (2) just after Khan told Mr. Rajaratnam that

Google was going to announce poor financial results, in July 2007, Khan sent to Hussain a FedEx envelope addressed to a "Marlene."  Opp. 24-25.[4]

    None of the government's proof, however, even begins to establish that Mr. Rajaratnam *knew of* any benefit that Khan had conferred on Bhalla, Shah, or Hussain.  No proof was adduced at trial that Mr. Rajaratnam ever met or spoke with Bhalla, Shah, or Hussain, or even knew who they were.  Neither does the government attempt to claim that Mr. Rajaratnam knew of the Lehman account or the FedEx envelope.[5]

    To prove knowledge, the government relies entirely on the claim that "[t]he jury was entitled to infer" that Mr. Rajaratnam knew that Khan's sources must have been "breaching their fiduciary duties because they expected some actual or potential personal benefit," because Mr. Rajaratnam was proven to be a "sophisticated businessman" who himself paid other insiders— namely, Kumar and Goel—for inside information.  Opp. 25.  The government argues that it was "perfectly reasonable" for the jury to infer that "Rajaratnam understood that Inside Information could not be obtained for free."  Opp. 26.

    As discussed above, this is exactly the inference that *Newman* says is legally inadequate. In *Newman*, too, the government argued that Newman and Chiasson, "as sophisticated traders . . . must have known that information was disclosed by insiders in breach of a fiduciary duty, and not for any legitimate corporate purpose."  773 F.3d at 443-44.  The government contended that

---

[4]  In failing to address the Hilton trade at all, the opposition tacitly concedes that as to that trade the government failed even to present proof of a benefit-in-fact received by the insider, Shah.

[5]  The government misleadingly states in its brief that "on July 13, 2007, Khan told Rajaratnam that she had learned from an insider—Hussain—that Google was going to announce unexpectedly poor financial results."  Opp. 24 (citing GX 58, GX 59; Tr. 3127, 3135-51).  The exhibits and testimony cited by the government, however, do not refer to Mr. Rajaratnam ever having learned, from Khan or any other source, the identity of Hussain.  Instead, the cited evidence merely established that Hussain was in fact Khan's source, known to Khan alone.

it was reasonable to infer that insiders disclose confidential information "for some personal reason rather than for no reason at all." *Id.* at 454 (quoting government brief). Also as it does here, the government argued that the defendants' payments to others for inside information, or concealment of the basis for their own trades, created a fair inference that the defendants knew that the remote insiders had received personal benefits. Specifically, the government claimed that because Newman had paid his immediate tipper, Goyal, he must have known that Goyal's contact, the Dell insider, had also received a personal benefit. *Id.* at 448. It contended that Chiasson's instruction to a co-worker to create "bogus" and "sham" reports relating to his trades demonstrated that Chiasson must have known that the insiders who had tipped information about Dell and NVIDIA had obtained personal benefits in exchange for doing so. Gov't Br., *United States v. Newman*, 2013 WL 6163307, at *27 (2d Cir. Nov. 14, 2013).

*Newman* rejected—emphatically—the same premise advanced here: that inside information is necessarily disclosed for a personal benefit. 773 F.3d at 454 ("[T]he Supreme Court affirmatively rejected the premise that a tipper who discloses confidential information necessarily does so to receive a personal benefit") (citing *Dirks*, 463 U.S. at 661-62). *Newman* held that the very disclosures at issue in that case were *not* motivated by conferring an "objective, consequential" benefit on the insider, but instead by "the mere fact of a friendship . . . of a casual or social nature." *Id.* at 452. *Dirks* also involved "tippers" whose disclosures were not motivated by the prospect of personal gain, or even self-interest. The sources in *Dirks* were whistleblowers whose motivation was to "expose the fraud" at their own company, Equity Funding, thereby benefitting the company and its shareholders. *Dirks*, 463 U.S. at 665-67. The Supreme Court held that the petitioner Dirks, an investment advisor with whom the insiders had shared their information, and who in turn relayed the insiders' reports of wrongdoing to others

who then sold their Equity Funding stock, could not be held liable for violating Rule 10(b)-5. *Id.* at 650-51, 667. The Court reasoned that because the Equity Funding insiders could not have breached their fiduciary duty absent having received "personal benefits" in exchange for their disclosures, there was no derivative breach by Dirks. *Id.* at 660-62, 667.

The measure of the miscalculation (or misunderstanding) in the government's argument is that *Newman* and *Dirks* would not hold as they do, if the government were correct. The very premise of the insider trading precedents that have defined breach of fiduciary duty is that, as *Dirks* puts it, "[a]ll disclosures of confidential corporate information are *not* inconsistent with the duty insiders owe to shareholders." *Id.* at 661-62 (emphasis supplied). *Dirks* lists multiple types of disclosures which involve no breach of fiduciary duty: disclosures to analysts and disclosures based on the mistaken belief that the information is already public or that the information is "not material enough to affect the market." *Id.* at 658-59, 662. *Newman* discusses the proof in that case that showed that "analysts at hedge funds routinely estimate [financial] metrics" based on information that companies "routinely leak[]" and "selectively disclose[]." 773 F.3d at 454-55.

The fact that inside information is often disclosed for reasons other than a "pecuniary-like" personal benefit is precisely why the law requires the government to prove that Mr. Rajaratnam knew that Bhalla, Shah, and Hussain received "objective, consequential" benefits in exchange for providing the information they disclosed and on which Mr. Rajaratnam traded. Absent that knowledge, Mr. Rajaratnam's trades were not proven to have been illegal because, as *Newman* also reaffirmed, "nothing in the law requires a symmetry of information in the nation's

securities markets." *Id.* at 449.  As in *Newman* and *Dirks*, the extent of the proof here was the defendant's obtaining of an informational advantage—in other words, non-criminal conduct.[6]

Count Two should be vacated and Mr. Rajaratnam re-sentenced after the trades underlying that Count, and the value of the three trades, are excluded from "relevant conduct."

### 2.  Counts Five, Eight, Nine, and Ten (Akamai Trades)

The same trades based on confidential information about Akamai, and relayed to intermediary Danielle Chiesi by Kieran Taylor, a marketing director at Akamai,[7] are at issue in Counts Five, Eight, Nine, and Ten.  The government also maintained at trial, and Judge Holwell accepted at sentencing, that Mr. Rajaratnam realized profits of over $5 million from the Akamai trades, all three of which took place in late July 2008.  Tr. 3473-74; GX 44; S.Tr. 25-26; PSR ¶¶ 58, 77.

The government fails to demonstrate with respect to the Akamai trades that it even presented proof of benefit-in-fact—*i.e.*, that Taylor received more than mere friendship in return for disclosing to Chiesi that Akamai was going to "guide down," or report poorer than expected financials.  GX 532; GX 532-T.  According to the government, in wiretapped conversations between Chiesi and Taylor, Chiesi provided Taylor with tips to buy AMD, Taylor reciprocated with a "major present" of "information," and the two spoke in intimate, and not merely friendly, terms.  Opp. 28-29.  This argument wrongly disregards, however, that these recorded

---

[6]  The government repeatedly cites (*e.g.* Opp. 25, 29, 32), *United States v. Whitman*, --- F. Supp. 3d ----, 2015 WL 4506507, at *5 (S.D.N.Y. July 22, 2015), as support for its claim that it need not prove the defendant had "'specific knowledge of the precise benefits the corporate insider expected to receive.'"  In *Whitman*, however, the government introduced recorded calls in which Whitman himself referenced that the "mole" at Google had been lost because his intermediary had failed to pay the mole.  *Id.*  Here, by contrast, the government failed to present evidence that Mr. Rajaratnam knew of any benefit that Khan had conferred on Bhalla, Shah, or Hussain.

[7]  The opposition brief incorrectly refers to Taylor as Kiernan Taylor.  Opp. 7.

conversations—between Chiesi and Taylor only—took place in September and October 2008, *months after* the Akamai trades.  Opp. 28-29 (citing and quoting GX 698-T; GX 703-T).  Further, at the time, the pair were discussing inside information about AMD, and in particular Mubadala's planned investment in AMD, not Akamai.  *See* discussion *infra* at n.9; GX 698-T ("I want you to buy AMD"); GX 703-T ("I love AMD right now").  Any benefits spoken of in September and October thus were not proven to have been received by Taylor "in exchange for the disclosure" of the Akamai information.  *See Newman*, 773 F.3d at 447.[8]

　　More importantly, the government never proved that Mr. Rajaratnam *knew* of any benefit that Chiesi conferred on Taylor, beyond knowledge of a friendship.  The government never proved that Mr. Rajaratnam ever knew Taylor's identity, other than as a "guy" who had "just called" Chiesi and volunteered information about Akamai.  GX 532; GX 532-T.  The government thus resorts to arguing, incorrectly, that it was fair for the jury to infer that Mr. Rajaratnam knew of Taylor's receipt of a personal benefit because "Rajaratnam was aware that insiders do not give out Inside Information for free"; because Mr. Rajaratnam had "a quid pro quo relationship" with his contact, Chiesi; and because Chiesi provided Taylor with "pecuniary-like benefits" in fact.  Opp. 29.  For the reasons already stated, these arguments are foreclosed by *Newman*.[9]

---

[8]  Nor, contrary to its argument now, did the government ever maintain at trial that it had proven any "objective, consequential" benefit that Taylor had received from Chiesi in exchange for disclosing information about Akamai.  In its summation, the government argued that the reason for Taylor's disclosure on the "call where Ms. Chiesi says Akamai is going to guide down" was mere friendship:  "Mr. Rajaratnam knows . . . Taylor is giving those tips to Chiesi because of that friendship."  Tr. 5306.

[9]  The government also argues that the inference of Mr. Rajaratnam's knowledge is "strengthened" because Mr. Rajaratnam discussed with Chiesi "how Chiesi feared being investigated" and gave Chiesi "advice on how to avoid detection by trading in and out of a

Notably, the government's argument that it proved knowledge-of-benefit, based on the Chiesi-Taylor conversations, is also contrary to the position it took at trial. As Mr. Rajaratnam pointed out in his opening brief (Mot. 23 n.13), at trial the government claimed that it was seeking to admit the two conversations from the fall of 2007 *only* to prove *Taylor*'s "intent to breach a duty to *his* company" when he offered the information about Akamai. Tr. 3111-15 (emphasis supplied). Specifically, the government argued that "regardless of whether Mr. Rajaratnam knew about [any benefit conferred by Chiesi on Taylor] or not" (Tr. 3115), Chiesi's offers of information to Taylor in September and October, and expressions of "love" at that time, tended to prove that Taylor had the "intent . . . to breach his duty" two and three months earlier when he had tipped Chiesi that Akamai would "guide down." Tr. 3113-14. The evidence does not now bear on Mr. Rajaratnam's state of mind when at trial it bore only on Taylor's.

The government maintains in the alternative that even Mr. Rajaratnam's actual innocence as to the Akamai trade is irrelevant because Count Five also is "predicated on Rajaratnam receiving Inside Information from Kumar, and in turn providing it to Chiesi." Opp. 27 (citing S2 ¶¶ 29-35). Count Five encompasses, in addition to the Akamai trades, allegations that Chiesi and Mr. Rajaratnam exchanged confidential information about AMD in August 2008 (which related to Mubadala's plan to invest in AMD). S2 ¶¶ 34-35; *see also* App'x A. The government maintains that because Kumar testified that Mr. Rajaratnam paid him for information about the

---

stock." Opp. 29-30 (citing GX 594-T-R and GX 641-T). Again, however, the government cites to evidence about AMD/Mubadala—a different trade the pair were discussing months later. Government exhibit GX 594-T-R is a transcript of an August 27, 2008 conversation in which Mr. Rajaratnam suggests that Chiesi continue to "buy and sell [AMD]" just after Chiesi asks, "Do you think that I should be showing a pattern of trading AMD?" and notes that she was considering doing so because "[t]here are people that . . . hate me," including "Bob Moffatt [an executive at IBM]." GX 594; GX 594-T-R. Government exhibit GX 641-T sets forth the content of a September 30, 2008 call which began with Mr. Rajaratnam's statement that "[t]he date is October 7" for "AMD." GX 641; GX 641-T.

AMD/Mubadala deal and then passed that information to Chiesi, the Count Five conviction

should stand even if it failed to prove that the Akamai shares were illegally traded.  Opp. 27-28.

This argument also is meritless.  First, Mr. Rajaratnam's demonstration that he is actually

innocent of the Akamai trade is sufficient to invalidate his conviction on Count Five.[10]  Second,

---

[10]   Contrary to the government's suggestion, the rule of *Yates v. United States*, 354 U.S. 298 (1957), applies here, because instructional error tainted the jury's deliberations.  *Id.* at 312.  The government's defense of the correctness of the jury charge, which it relegates entirely to a footnote, is unavailing.  Opp. 19 n.2.  As set forth in Mr. Rajaratnam's opening brief, the trial court erred in instructing the jury that the government need only prove that Mr. Rajaratnam knew that "the insider *would* directly or indirectly obtain some personal benefit," and only "*if*" material, non-public information was disclosed by an insider.  Mot. 10 (citing Tr. 5622-23).  This instruction was unintelligible, including in failing to require the jury to find that confidential information *had been* disclosed for a benefit.  Mot. 10, 16-17.  The court's erroneous instruction on benefit-in-fact also rendered any knowledge requirement a nullity.  The court instructed the jury, contrary to what *Newman* now requires, that a "benefit" could include the "satisfaction that comes with making a gift to a relative or friend."  *Compare* Tr. 5622 *with Newman*, 773 F.3d at 452 (requiring "close, personal relationship" that "generates an exchange that is objective, consequential, and represents at least a potential gain").  As a whole, then, the charge permitted the jury to convict so long as, at a minimum, Mr. Rajaratnam knew that whichever insider tipped (or would have tipped) Chiesi or Khan or Smith, he or she provided the tip (or would have done so) as a result of being motivated, at the least, by his or her friendship with Chiesi or Khan or Smith.  This was not an instruction that "adequately inform[ed] the jury on the law."  *See United States v. Hassan*, 578 F.3d 108, 129 (2d Cir. 2008) (charge that leaves open the possibility of conviction based on lawful or uncharged conduct is erroneous); *see also Chiarella v. United States*, 445 U.S. 222, 231-33 (1980) (reversing conviction for insider trading where instructions failed to require jury to find element of defendant's duty to disclose or refrain from trading).

Under *Hedgepeth v. Pulido*, 555 U.S. 57 (2008) (*per curiam*), the instructional error requires the court, even in the context of a Section 2255 petition, to consider whether the erroneous instruction had a "substantial and injurious effect" in contributing to the jury's finding of guilt.  *Id.* at 61-62 (where there is valid and invalid theory on which jury may have convicted petitioner, the court assesses the likelihood that the jury convicted on the invalid theory).  Here, the record demonstrates exactly such an effect.  There is no question that the jury found guilt on the basis of the Akamai trades, because it convicted on the substantive Counts Eight through Ten, although there was no evidence of knowledge-of-benefit as to those trades.  Because, by contrast, there are no substantive counts relating to the AMD/Mubadala trade, it is impossible to say that the jury returned a verdict of guilt on Count Five on the sole basis of that trade.  The fact that Kumar's testimony is the principal proof of the AMD/Mubadala trades encompassed by Count Five further undermines the government's contention that Count Five should be upheld regardless of whether Mr. Rajaratnam is actually innocent of having conspired to illegally trade in Akamai shares.  *See* discussion *infra* at Argument, Section II.

the government's argument ignores that the Akamai information disclosed by Taylor was the sole basis of Counts Eight, Nine, and Ten, and thus that the convictions on those Counts must be vacated, at a minimum, given the absence of proof that Mr. Rajaratnam knew of any personal benefit received by Taylor.  Third, the government's assertion ignores that if it failed to adduce proof that the Akamai trades constituted insider trading, the Akamai trades were improperly included as "relevant conduct" at sentencing (including insofar as the value of the Akamai trades was counted as gain to Mr. Rajaratnam).  If the conviction on any Count is vacated, Mr. Rajaratnam is entitled to re-sentencing, and such re-sentencing should be based solely on conduct proven to be criminal.  *See* U.S.S.G. § 1B1.3 (definition of "relevant conduct"); *see also United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001) ("relevant conduct under the Guidelines must be criminal conduct"); *United States v. Dickler*, 64 F.3d 818, 830-31 (3d Cir. 1995) (same).

The convictions on Counts Five, Eight, Nine, and Ten should thus be vacated and Mr. Rajaratnam re-sentenced.

### 3.    The ICST Trade Underlying Count One

As described in Mr. Rajaratnam's opening brief, the government presented proof that Mr. Rajaratnam traded in ICST shares in early 2005, purportedly based on information furnished by Adam Smith, a Galleon analyst, who in turn had obtained the information from Kamal Ahmed, a senior banker at Morgan Stanley.  Mot. 23-24 (citing Tr. 2489-94, 2496-98).  Count One also encompassed at least four other trades, including two other instances in which Ahmed was alleged to have provided confidential information to Smith, which Smith then relayed to Mr. Rajaratnam in 2006 and 2008.  *See* App'x A (specifying other Smith-related tips regarding AMD's acquisition of ATI and Vishay).

The government argues first that because Mr. Rajaratnam has not sought to have his conviction on Count One vacated, and has maintained that he is actually innocent of engaging in

13

insider trading only with respect to the ICST trade, "he is entitled to no relief, including resentencing at a lower offense level." Opp. 30. As argued above, however, if the conviction on any Count is vacated, Mr. Rajaratnam is entitled to re-sentencing based solely on conduct proven to be criminal. The ICST trade was assigned a value of over $2.8 million in gain at Mr. Rajaratnam's sentencing. *See* PSR ¶ 58.

The government's argument that Mr. Rajaratnam has failed to demonstrate his actual innocence of the ICST trade is also without merit. The government again fails to identify any proof that Mr. Rajaratnam knew of any benefit received by the insider—here, Ahmed—in exchange for disclosing the tipped information. Instead, the government cites to the following admission of Smith at trial (albeit without including the question which specifies the time frame):

> Q.    [W]hen you discussed this with Kamal Ahmed in 2005, you did not have an agreement that two years later you would make an introduction for him that would benefit him, right?

> A.    *No, I had not offered him any benefit for that information that he gave me at that time.*

Tr. 2806 (emphasis supplied). The government asserts that based on this exchange, the jury reasonably could have concluded that "Rajaratnam understood that Ahmed expected to benefit in exchange for the Inside Information," because *Newman* holds that a benefit can include an "expected or potential benefit." Opp. 32.

The government's argument ignores what its own cooperating witness said. Smith had "not offered [Ahmed] any benefit" in 2005, and thus there could have been no fair inference of any benefit "expected" by Ahmed. Here, exactly as in *Newman*, the existence of *quid pro quo* was "disavowed" by one of the purported parties to the exchange. *Newman*, 773 F.3d at 452-53

(the *sine qua non* of an insider's breach is "a relationship of *quid pro quo*" at the time of the

disclosure).  Mr. Rajaratnam could not have known of a benefit that Smith denied conferring.[11]

      The government relies alternatively on the assertion that because Smith testified that

Galleon could potentially have helped Ahmed win business, "'to the extent Galleon,'

collectively, 'had any influence over the decisions of those executives,'" and because Galleon

"reasonably includes . . . Mr. Rajaratnam," there was sufficient evidence that Mr. Rajaratnam

knew of an "expected benefit to Ahmed."  Opp. 32-33 (citing Tr. 2509).  This argument is

incoherent.  The fact that Galleon may have had the capability of exerting influence in the hiring

of an investment bank does not establish Mr. Rajaratnam's knowledge of any benefit received by

Ahmed, or even expected by him.  Nor does the existence of such a capability establish even

benefit-in-fact, *i.e.*, that when Ahmed furnished confidential information about ICST, he did so

in exchange for the exercise of any potential influence by Galleon.

      The government next contends that it was fair for the jury to conclude that Mr.

Rajaratnam knew that "the [ICST] information was coming from an insider in violation of a

fiduciary duty," because Smith used a code of "[t]he two eyes" to refer to ICST and because

Smith testified that Mr. Rajaratnam instructed his analysts "not to put sensitive information in

writing."  Opp. 31.  This does not tend to prove that Mr. Rajaratnam must have known that Smith

---

[11]   As it did in addressing the Chiesi-Taylor interactions, the government attempts to create an
impression of having proven, at the least, benefit-in-fact, by disregarding the dates of the
purported benefits and referring to evidence that relates to trades other than the trades at issue.
Thus, the government quotes from Smith's testimony that he gave Ahmed "thoughts about what
was going on in the market," introduced Ahmed to "executives at different companies," and
"recommended Ahmed to executives at technology companies."  Opp. 31-32 (citing Tr. 2508).
But as already described, when asked about the year 2005 in particular—and not the later years
in which Ahmed provided information about ATI and Vishay rather than ICST—Smith said that
he had offered no benefit to Ahmed at that time.  Tr. 2806.  Smith also did not claim on re-direct
examination that he had either introduced Ahmed to anyone to help him win business in 2005, or
had had an agreement at the time to do so.  Tr. 2988.

conferred a personal benefit upon Ahmed because—as *Newman* concluded—confidential information is often disclosed without a benefit.  *See* discussion *supra* at 6-9.  Further, when Smith testified that Mr. Rajaratnam did not want to put "sensitive" information in writing, he also stated that "[w]hat was sensitive about [the ICST information]" was that "[i]t was an impending merger."  Tr. 2498-500.  None of this fairly supports the inference that Mr. Rajaratnam knew that Ahmed had received a benefit for tipping Smith.  The government's argument also assumes that Mr. Rajaratnam's purported acts of concealment were prompted by his knowledge that the receipt of a benefit by the insider would determine the legality of his trading.  It nowhere explains why this assumption is valid.

Mr. Rajaratnam is actually innocent of the ICST trade.

\* \* \*

Finally, in addition to being a doomed enterprise in light of *Newman* itself, the government's attempt to muster proof that Mr. Rajaratnam knew that the relevant remote insiders had received personal benefits is a *post hoc* contrivance.  The government never claimed at trial that it had proved knowledge at all, via a "fair inference" or otherwise.  Instead, it repeatedly and wrongly characterized its burden to be one of proving benefit-in-fact alone.  Tr. 5543, 5546 (disclaiming any obligation to prove even benefit-in-fact on conspiracy counts and arguing that on substantive counts, as a final requirement, "the government also needs to prove to you that the insider in some way benefited from breaching the duty").  In the over 220 pages of government summations, the government claimed to have proven knowledge-of-benefit as to a single one of the dozen trades at issue.  The government stated, regarding the Akamai trades, that "Mr. Rajaratnam knows, he's friends with Mr. Taylor and he knows the relationship, he knows Taylor is giving those tips to Chiesi because of that friendship."  Tr. 5306; *see also* Tr. 5546.  Thus, in

the sole reference to knowledge-of-benefit in any part of its summations, the government *incorrectly* claimed that it could prove Mr. Rajaratnam's knowledge of a benefit based on a mere friendship between Chiesi and Taylor.

The inference that the government now claims is reasonable, and that protects the validity of the convictions and sentence, is not one that the government ever asked the jury to draw.

**B.      Mr. Rajaratnam's Former Counsel Rendered Ineffective Assistance of Counsel**

Although the Court need not reach the question given the demonstration of actual innocence, the record also establishes that Mr. Rajaratnam's former counsel rendered constitutionally ineffective assistance of counsel.

The government's argument to the contrary mistakenly focuses on the "reputation" of Mr. Rajaratnam's "highly experienced" former counsel. Opp. 20.  But the point is that Mr. Rajaratnam's prior counsel were indeed extremely able in advocating—well before *Newman* was even tried—the correct reading of *Dirks.*  On this basis, and as described in the opening brief, they requested during trial that the jury be instructed that a "benefit" must be more objective and consequential than "the satisfaction that comes with making a gift to a relative or friend," and that Mr. Rajaratnam's knowledge of the benefits obtained by even remote insiders was an element of the insider trading crime.  Mot. 8-10.

By contrast, the objectively unreasonable decisions were trial counsel's failure to object when the charge, as delivered, failed to require the jury to find knowledge-of-benefit or when the government repeatedly disclaimed in its summations that it need prove knowledge.  Mot. 10, 17. On appeal, counsel failed to challenge the invalid instruction on knowledge, or the sufficiency of the evidence of Mr. Rajaratnam's knowledge of any benefit received by the remote insiders, in the instances of the same Counts and trades that are the subject of this motion.

Had Mr. Rajaratnam's former counsel pursued, past the reading of the charge, the very arguments that they themselves recognized to be worthy, the result of Mr. Rajaratnam's trial or appeal would have been different.  Knowing that there was *no* evidence of knowledge-of-benefit as to multiple trades, counsel nonetheless failed to see their own strategy through to the end and pursued instead arguments that were less well-founded.  Ineffective assistance of counsel also excuses Mr. Rajaratnam's procedural default.

## II.   ANIL KUMAR'S PERJURY REQUIRES VACATUR OF THE CONVICTIONS ON COUNTS FOUR AND THIRTEEN

Mr. Rajaratnam demonstrated in his opening brief that Anil Kumar's testimony at the trial of Mr. Rajaratnam's brother, Rengan, exposed Kumar to have lied repeatedly, and strategically, when testifying against Mr. Rajaratnam.  Mot. 38-39.  Kumar, the government's key witness, also repudiated precisely the parts of his testimony that painted Mr. Rajaratnam in the most damning light and that provided the basis for the government to argue to the jury that the information Kumar gave to Mr. Rajaratnam was non-public, confidential, and material.

The government's response orbits around the wrong question entirely.  In the government's view, no relief is warranted because "[a]t Rengan's trial, Kumar testified repeatedly that he had engaged in insider trading with Rajaratnam, just as Kumar had testified at Rajaratnam's trial."  Opp. 34-35 (arguing that Kumar's inculpation of Mr. Rajaratnam was "corroborated").  Mr. Rajaratnam is not making a sufficiency challenge, however.  In assessing newly-discovered evidence, the relevant question is whether Kumar's later admissions, had they been available to impeach Kumar at Mr. Rajaratnam's trial, would have sufficiently damaged Kumar's credibility to induce "reasonable doubt in the minds of enough jurors to avoid a conviction."  *Seijo,* 514 F.2d at 1364 (quotation omitted); *see also United States v. Wallach*, 935 F.2d 445, 458 (2d Cir. 1991) (question is whether "the jury probably would have altered its

verdict" had it been able to assess impact of new evidence "not only upon the factual elements of

the government's case but also upon the credibility of the government's witness"); *Napue v.*

*Illinois*, 360 U.S. 264, 269 (1959) (jury's determination of the "truthfulness and reliability" of a

witness "may well be determinative of guilt or innocence").  This standard is amply satisfied.

First, the government's assertion that there was no perjury at Mr. Rajaratnam's trial, only

an "honest mistake of recollection" at Rengan's, is feeble.  Opp. 37.  As set forth in Mr.

Rajaratnam's opening brief (Mot. 28-40), and summarized below, Kumar's later testimony was

irreconcilable with the testimony that he gave when testifying against Mr. Rajaratnam.

| Topic | Mr. Rajaratnam's Trial | Rengan Rajaratnam's Trial |
|---|---|---|
| Whether McKinsey Forbade Side Consulting Agreements | McKinsey "does not permit consulting work on the side." | Side consulting "wasn't prohibited at McKinsey." |
| Whether Rengan Was In or Out of the Conspiracy | Rengan was a full partner of his brother in insider trading. | Rengan did not participate in any "scheme to trade inside information." |
| Why Kumar Began Tipping Mr. Rajaratnam | Mr. Rajaratnam was "persistent" in "pressing" for information and made Kumar feel that Kumar "owed" him confidential information. | Kumar took the initiative because he wanted Mr. Rajaratnam to support AMD and was "eager" to have Galleon become a McKinsey client. |
| The Materiality of the Information Kumar Provided | Kumar had "privileged" information from AMD and thus provided "much better certainty" than the "general" information and "speculation" in the marketplace. | Mr. Rajaratnam was already getting "all the information" from the "more reliable" source of Galleon's own client, Mubadala, and as a result of AMD's "actual conversations" with Galleon and "hundreds" of others. |
| Kumar's Characterization of the Quality of the Information He Furnished | "Confidential," "privileged," and "much better." | AMD/Mubadala became "a bit of a joke" because the pair "postured" about the information each had. Kumar found himself unable to provide any information that was "news" to Mr. Rajaratnam. |
| Whether Mr. Rajaratnam Tried to "Lure" David Palacek Into Insider Trading | Yes, and wiretapped conversations were about the "luring." | No, and wiretapped conversations were about Kumar's concern that Palacek was "rattled" by Chiesi's affair with the CEO of AMD, his client. |

19

These contradictions were not the product of a "falter[ing]" recollection.  Opp. 36.  Kumar did

not complain of a failing memory; he repeatedly put forth a different account.  Nor did the

prosecutors themselves believe that Kumar was being forgetful.  Instead, the government sought

to impeach its own former cooperating witness, whom it viewed to be "minimizing what was

going on," by "confront[ing] him" with his testimony from Mr. Rajaratnam's trial.  R.Tr. 886.

When the government tried a second time to impeach Kumar at Rengan's trial, it claimed a

"direct conflict" with his prior testimony and again invoked the rules governing impeachment,

not refreshing recollection.  R.Tr. 1038.

   The government's argument that Kumar's lies were unimportant in convicting Mr.

Rajaratnam is equally unavailing.  Each instance of perjury, in the government's view, is

"entirely beside the point," had "absolutely no bearing on Rajaratnam's guilt," and "simply [did]

not go" to guilt or innocence.  Opp. 37-38.  Of course, this begs the question of why the

government bothered to present the proof in the first place, and with such emphasis and at such

length.[12]  The "point" or "bearing" of the testimony that Kumar ultimately repudiated is self-

evident, in any event.  It was only if Mr. Rajaratnam knew and believed, for example, that

McKinsey forbade Kumar from entering into side consulting agreements, that Kumar credibly

could have claimed that it was Mr. Rajaratnam's idea, and not his own, to route Kumar's

consulting fees to Kumar's housekeeper in India, purportedly with the objective of "concealing"

the fees.  After all, Manju Das was Kumar's housekeeper and the potential tax liability Kumar's

---

[12]   The government's opposition brief, for example, simultaneously asserts that the Manju Das
episode was "entirely beside the point" (Opp. 37), while citing to Mr. Rajaratnam's "disguis[ing]
of his payments to Kumar" as a highlight of the purported evidence of his guilt (Opp. 10 (Factual
Background section)).

as well.  The purported concealment via "Manju Das" was an outsized topic at Mr. Rajaratnam's trial, founded on a lie.[13]

Similarly, to even propose that it is inconsequential that Kumar first testified that Rengan was a co-conspirator, and later that he was not, defies reality.  Opp. 38.  Kumar changed the very scope of the conspiracy to newly exclude *the defendant's own brother*.  Kumar's testimony that the Rajaratnam brothers had tried to "lure" and "suck" David Palacek into their illegal conspiracy had the obvious objective of painting Mr. Rajaratnam as a scheming predator, hungry for new "inside" sources (and was particularly prejudicial given that Palacek had passed away before trial).  Tr. 492, 518-19.  Kumar refused the prosecutor's efforts to elicit the same testimony at Rengan's trial, blithely denying that he regarded Palacek to have been at any risk, other than that of being disquieted by the news that AMD CEO Ruiz was sharing "pillow talk" with Chiesi.  R.Tr. 860-61.  This turnabout was undeniably "inconsistent," and consequentially so, as the government itself argued in seeking to switch to cross-examining its own witness at the later trial.  R.Tr. 886-88, 1038.

Most fundamentally, the government wrongly disregards that Kumar's perjury provided proof of the most hotly-contested elements at trial—the uniqueness and materiality of the information Mr. Rajaratnam obtained from Kumar, and its non-public nature.  Kumar was called for the very purpose of ensuring that the government could meet its burden as to those elements, notwithstanding the vaunted wiretap evidence.  The government's sole rejoinder—that Kumar never denied that Mr. Rajaratnam had sources of information other than himself (Opp. 37)—

---

[13]   As noted in Mr. Rajaratnam's opening brief, at the third trial at which the government presented the Manju Das saga—*United States v. Rajat Gupta*, 11 Cr. 0907 (S.D.N.Y.)—Judge Rakoff required it to produce documentation of the McKinsey policy against side consulting agreements.  Mot. 38 n.19.  The government admitted that there was none, and Judge Rakoff precluded Kumar's testimony.  *Gupta* Trial Tr. 1727-31.

again glosses over Kumar's sustained repudiations of his prior testimony and the significance of that change.  The government nowhere even addresses Kumar's devastating admissions at Rengan's trial, for example, that he understood Mr. Rajaratnam to have spoken to his client Mubadala itself about the AMD/Mubadala "handshake agreement" before it became public, that AMD had also engaged in "actual conversations" with Galleon (and hundreds of others) such that information beyond "rumors or speculation" was freely available, and that to the extent that he and Mr. Rajaratnam spoke about the AMD/Mubadala deal, Kumar was the loser in the "posturing" game of trying to show that he knew anything beyond what Mr. Rajaratnam already knew.  Mot. 34-36.  Judge Buchwald's assessment, rendered at sidebar, was that Kumar had clearly admitted that there were "no secrets," and nothing "not generally known," by the time the "handshake agreement" was announced.  Tr. 887, 1042.[14]

Kumar's perjury thus "bears on" Mr. Rajaratnam's guilt or innocence for the simple reason that Kumar's truthfulness and credibility bore on the jury's deliberations.  Kumar repeatedly, strategically turned his back on testimony that had been foundational in inculpating Mr. Rajaratnam.  He also made clear that the matter of whether he pointed an accusing finger (at either Mr. Rajaratnam or his brother) oscillated at his will.  A side-by-side reading of the two sworn accounts supports no conclusion other than willful, crafted lying.  Had Mr. Rajaratnam been able to impeach Kumar at his trial with Kumar's later testimony, reasonable doubt would have carried the day, on Counts Four and Thirteen at the least, as the conduct of the government itself at Rengan's trial, and the comments of the judge who presided at that same trial, suggest.

---

[14]   Instead of addressing Kumar's admissions that information about the AMD/Mubadala "handshake agreement" was freely available to Mr. Rajaratnam, and thus public rather than non-public, the government focuses irrelevantly on the fact that Kumar testified at both trials that Mr. Rajaratnam had received inside information about the AMD/Mubadala deal from both Kumar and Chiesi.  Opp. 37.

**CONCLUSION**

For the foregoing reasons, the convictions on Counts Two, Four, Five, Eight, Nine, Ten, and Thirteen should be vacated.  A new trial should be ordered on Counts Four and Thirteen or, in the alternative, a hearing should be held to determine whether Kumar perjured himself and the likely impact of that perjury.  Mr. Rajaratnam should be re-sentenced based on any Counts and offense conduct that survive this motion.


DATED:    New York, New York                    Respectfully submitted,
          November 6, 2015

                                                QUINN EMANUEL URQUHART &
                                                SULLIVAN, LLP

                                        By: */s/ Christine H. Chung*
                                                Christine H. Chung
                                                Adam M. Abensohn
                                                51 Madison Avenue, 22nd Floor
                                                New York, New York 10010
                                                (212) 849-7000

APPENDIX A:
COUNTS, TRADES AND TRADE CHARACTERISTICS
(TRADES CHALLENGED ON NEWMAN GROUNDS ARE BOLDED/HIGHLIGHTED)

| Count | Trade(s) | Date | Trade Value | Intermediary | Insider/Tipper |
|---|---|---|---|---|---|
| One (Galleon Conspiracy) | **ICST** | June 2005 | $2,825,527 | Adam Smith | Kamal Ahmed (at Morgan Stanley) |
| | AMD acquisition of ATI | Mar. 2006 | $22,938,866 | Adam Smith | Kamal Ahmed (at Morgan Stanley) |
| | Xilinx | Nov./Dec. 2006 | $978,684 | Raj R. | Kris Chellam (at Xilinx) |
| | Vishay | May 2008 | No Trade Executed | Adam Smith | Kamal Ahmed (at Morgan Stanley) |
| | Goldman | Sept. 2008 | $4,641,555 | None | Rajat Gupta (Goldman) |
| Two (Khan Conspiracy) | **Polycom** | Jan. 2006 | $482,960 | Roomy Khan | Sunil Bhalla (Polycom) |
| | **Hilton** | July 2007 | $4,171,763 | Roomy Khan | Deep Shah (Moody's) |
| | **Google** | July 2007 | $18,264,041 | Roomy Khan | Shammara Hussein (Market Share Partners) |
| Three (Goel Conspiracy) | Intel (earnings) | Apr. 2007 | $2,481,271 | None | Rajiv Goel (Intel) |
| | Intel (investment in Clearwire) | Mar. 2008 | $851,724 | None | Rajiv Goel (Intel) |
| Four (Kumar Conspiracy) | AMD (acquisition of ATI) | Mar. 2006 | $22,938,866 | None | Anil Kumar (McKinsey) |
| | AMD (Mubadala) | Mid to Late 2008 | None | None | Anil Kumar (McKinsey) |

| | | | | | |
|---|---|---|---|---|---|
| Four (Kumar Conspiracy) (cont'd) | eBay | Oct. 2008 | $883,973 | None | Anil Kumar (McKinsey) |
| | Business Objects | October 2007 | None | None | Anil Kumar (McKinsey) |
| | Spansion | May 2008 | No Trade Executed | None | Anil Kumar (McKinsey) |
| Five (Chiesi Conspiracy) | **Akamai** | July 2008 | $5,139,851 | Danielle Chiesi | Kieran Taylor (Akamai) |
| | ATI (Mubadala) | Mid/Late 2008 | None | Danielle Chiesi or Raj R. | Bob Moffatt (IBM) and Hector Ruiz (ATI) and Anil Kumar (McKinsey) |
| Six | Intel (investment in Clearwire) | Mar. 24, 2008 | Same as in Count Three (Intel/Clearwire trade) | | |
| Seven | Intel (investment in Clearwire) | Mar. 25, 2008 | Same as in Count Three (Intel/Clearwire trade) | | |
| Eight | **Akamai** | July 25, 2008 | Same as in Count Five (Akamai) | | |
| Nine | **Akamai** | July 29, 2008 | Same as in Count Five (Akamai) | | |
| Ten | **Akamai** | July 30, 2008 | Same as in Count Five (Akamai) | | |
| Eleven | People Support | July 28, 2008 | $102,143 | None | Raj R. |
| Twelve | People Support | Oct. 7, 2008 | $49,806 | None | Raj R. |
| Thirteen | ATI acquisition of AMD | Mar. 2006 | Same as in Count Four (ATI acquisition of AMD) | | |
| Fourteen | Intel (earnings) | Apr. 2007 | Same as in Count Three (Intel earnings trade) | | |
| **Total** | **$63,812,164** | | **$63,812,164** | | |